UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
No. 12-3314-BLG

UNITED STATES OF AMERICA

v.

JULIANA ROSA TOME FROES, and
FABIO RODRIGUES FROES,

    Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

    Respectfully submitted,

    WIFREDO A. FERRER
    UNITED STATES ATTORNEY

BY: _____
    MARTON GYIRES
    ASSISTANT UNITED STATES ATTORNEY
    Court I.D. No.: A5501696
    99 N. E. 4th Street
    Miami, Florida 33132-2111
    TEL (305) 961-9208
    Marton.Gyires@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| JULIANA ROSA TOME FROES, and | ) | Case No. 12-3314-GARBER |
| FABIO RODRIGUES FROES, | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __9/16/2009 to 7/18/2010__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. 1324(a)(1)(a)(v)(I) | Conspiracy to knowingly encourage and induce aliens to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is and will be in violation of law. |

This criminal complaint is based on these facts:
See attached affidavit of Special Agent ALEXANDRE SCHMIDT.

☒ Continued on the attached sheet.

*Complainant's signature*

ALEXANDRE SCHMIDT, HSI SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9-27-12

*Judge's signature*

City and state: __Miami, Florida__    Magistrate Judge Barry L. Garber
*Printed name and title*

## **AFFIDAVIT**

I, Alexandre Schmidt, being duly sworn, herby depose and state the following:

1. I am a Special Agent with U.S. Immigration and Customs Enforcement, Homeland Security Investigations (HSI), and have been employed in such capacity since September 2006. I am currently assigned to the Special Agent in Charge Miami, Florida, Airport Narcotics Group, where I am responsible for conducting investigations for violations of the immigration and customs laws of the United States. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center. I have also received specialized training on the requirements for aliens seeking to enter the United States and have experience in conducting investigations involving human and narcotics smuggling, wire and bank fraud, and money laundering.

2. The statements contained in this affidavit are based upon my own personal knowledge, as well as information provided to me by other law enforcement officials and employees of HSI. This affidavit is submitted for the sole purpose of establishing probable cause in support of the issuance of a criminal complaint and warrant for Juliana Rose Tome Froes ("JULIANA") and Fabio Rodrigues Froes ("FABIO") for conspiracy to commit the offense of encouraging and inducing aliens to come to, enter, or reside in the United States, with knowing and reckless disregard of the fact that such coming to, entry, or residence is and will be in violation of law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I). Therefore, the statements in this affidavit do not contain all of the information known to law enforcement regarding this investigation.

3. On July 18, 2010, at approximately 6:00pm, a Florida Fish and Wildlife Commission (FFWC) vessel was patrolling the area at the Hillsboro Inlet in the Intracoastal

Waterway and encountered the vessel "Got Crabs." After the vessel entered the Hillsboro Inlet, Officer Michael Naujoks of the FFWC conducted a routine encounter and a boat safety inspection, and encountered four persons on board the vessel.

4. Officer Naujoks boarded the vessel and was presented with a Brazilian identification card by the first subject, later identified as Wellington Dos Santos Silva ("Dos Santos"). Because Dos Santos did not speak English, Officer Naujoks asked another passenger, Crisley Pereira Alves (a U.S. Legal Permanent Resident) to interpret. Through Alves, Dos Santos told Officer Naujoks that he (Dos Santos) had entered the United States three months before through JFK International Airport and that he was on his way to visit friends in Boston. Officer Naujoks requested a records check on Dos Santos and learned that he had been previously deported from the United States. Through subsequent investigation, Officer Naujoks learned the identities and status of the other persons on board the vessel: one person was a United States Citizen, one was a Legal Permanent Resident of the United States, and the other, like Dos Santos, was a Brazilian national. Believing that he had encountered Brazilian Nationals attempting to enter the United States illegally, Officer Naujoks called for assistance from the U.S. Border Patrol (USBP) at the Aldorf Park Marina, where the vessel was taken for safety reasons because weapons had also been found on board.

4. Dania Beach USBP agents, including Supervisory Border Patrol Agent Lazaro Guzman and Agent Weyn Rodriquez, were sent to assist and arrived at the Alsdorf Park Marina shortly thereafter. Agent Rodriquez conducted an immigration inspection of the four subjects. The subject identified as Dos Santos told Agent Rodriquez that he had just entered the United States illegally from the Bahamas.

4. Special Agents from the Department of Homeland Security, Immigration and

2

Customs Enforcement, SAC Miami, Group 8 ("ICE"), were subsequently called and initiated an investigation into the interdiction and alien smuggling organization.

5. During a post-Miranda interview, Dos Santos stated that he had made arrangements to enter the United States illegally with a travel agency in Brazil, called Costamares Travel, for $16,050. Dos Santos advised that he traveled from Brazil to Paris, then to London and the Bahamas, where Dos Santos stayed for approximately one month waiting to be taken to the United States.

6. Subsequently, investigators learned from a Confidential Informant that Dos Santos made several statements while detained at the Broward Transitional Center ("BTC"). Dos Santos stated that "Juliana" from Costamares Travel organized his smuggling into the United States, and that money ($6000 each) was paid to associates of Juliana, known as "Ana" or "Poliana" in a town near Newark, New Jersey, as well as to "Alexandro" or "Alex" or "Renato." "Juliana" was later identified as Juliana Rose Tome Froes ("JULIANA"). Dos Santos also stated that he traveled through France (two or three nights), then through London on his way to Nassau, Bahamas. Dos Santos then went to Freeport, Bahamas, where he met a woman named "Ana" or "Poliana."

7. During a subsequent interview, Dos Santos stated that while he was previously being deported from the United States, he learned of a smuggler in Brazil named "Juliana" at Costamares Travel, and obtained her phone number. Upon returning to Brazil, Dos Santos called JULIANA and inquired about being smuggled back into the United States. Dos Santos advised JULIANA that he had previously been deported from the United States. Dos Santos met with JULIANA she agreed to organize a smuggling trip into the United States for Dos Santos, and she agreed to deliver Dos Santos to New Jersey. JULIANA also gave specific instructions to Dos

3

Santos to aid in his smuggling, such as directing him to dress and act like a tourist from Brazil, to discard his Brazilian passport that had been issued from a U.S.-based Brazilian consulate and obtain one from Brazil, and she explained that his itinerary through Europe would support his tourist cover story. Dos Santos stated that JULIANA arranged his air travel from Brazil to Paris, then London and the Bahamas. At each stage of the trip, Dos Santos would speak to JULIANA about his status and receive instructions.

8. During an interview with Dos Santos' wife, Marta Helena De Paula ("De Paula"), she stated that she spoke to JULIANA on the phone one time regarding making payments to JULIANA for her husband's smuggling trip. JULIANA told De Paula the price of the trip, approximately $16,000, and JULIANA gave specific instructions on how to pay her, including Brazilian bank account numbers and deposit instructions.

9. On September 16, 2009, at approximately 2:35 pm, personnel aboard the United States Coast Guard (USCG) Cutter "Bluefin" observed a marine vessel (suspect vessel) traveling west from international waters towards the United States coast. The USCG "Bluefin" began hailing the vessel and it was stopped approximately 10 miles east of Boynton Beach, Florida.

10. The USCG "Bluefin" boarding team approached and boarded the vessel. The boarding officer, Christopher Spurlock, and the boarding crew of five personnel, observed a total of six people on board the vessel, with a male subject, later identified as Afonso Maria Soares LOCATELLI, a Brazilian national, operating the vessel. Among the passengers, another Brazilian male was identified as Walderson Gomes Da Silva (Da Silva), as well as Cleiciane Pereira Marques (Pereira Marques) and Pablo Melo Santos (Melo Santos). Through a records check, investigators learned that Pereira Marques and Melo Santos had previously been deported from the United States. The remaining passengers were Brazilian nationals as well and none had

authorization to enter the United States.

11. Pereira Marques, during a post-Miranda interview, stated that after being deported to Brazil in 2008, she contacted the organizer who arranged that attempted smuggling into the U.S. The smuggler refused to refund the $8000 Pereira Marques had paid, but the smuggler agreed to smuggle Pereira Marques again and she would not have to pay the remaining balance of $8000 in smuggling fees until she arrived in the U.S. The smuggler made arrangements for Pereira Marques to travel from Brazil to Paris, then London, and on to Nassau, Bahamas, followed by Freeport, Bahamas. Pereira Marques traveled with Melo Santos the entire way. Upon arrival in Freeport, she and others were taken to a waterfront where they boarded a vessel and departed to the United States.

12. Melo Santos, during a post-Miranda interview, stated that he paid $16,000 in smuggling fees to an organizer in Brazil for him to enter the U.S. The smuggler arranged for Melos Santos to travel with Pereira Marques, and they traveled from Brazil to Paris, then London, and on to Nassau, Bahamas, followed by Freeport, Bahamas. Melos Santos told investigators that on September 16, 2009, he and the other passengers were taken to a waterfront where they boarded a vessel and departed for the United States.

13. Da Silva, during a post-Miranda interview, stated that he paid $16,000 to a smuggler in Brazil to make arrangements for his travel to the United States. Da Silva stated that the smuggler arranged for him to travel with Pereira Marques and Melo Santos. They traveled from Brazil to Paris, then London, and on to Nassau, Bahamas, followed by Freeport, Bahamas. On September 16, 2009, he and the other passengers were taken to a waterfront where they boarded a vessel and departed for the United States.

14. Investigators learned later that Da Silva had re-entered the U.S. and was residing

near San Francisco, California. On September 14, 2012, after locating Da Silva, agents from the Department of Homeland Security, Homeland Security Investigations (HSI), conducted an administrative arrest of Da Silva for illegally entering the United States.

15. During a post-Miranda interview, Da Silva stated that he has illegally entered the United States on three separate occasions. With respect to his entry on September 16, 2009, when Da Silva was apprehended near Boynton Beach, Florida, Da Silva stated that he had been smuggled by JULIANA, a smuggler in Brazil. Da Silva explained that in early September 2009, he contacted JULIANA to inquire about her arranging his trip to the U.S. At JULIANA's invitation, Da Silva met with JULIANA and her husband, "FABIO", at their residence and they discussed Da Silva being smuggled into the U.S. illegally. FABIO was later identified as Fabio Rodrigues Froes ("FABIO"). Also present was Da Silva's wife and Pablo Melo Santos, who was subsequently intercepted with Da Silva on September 16. Da Silva told JULIANA and FABIO that he did not have authorization to enter the U.S. JULIANA advised that it would cost R$32,000 (Brazilian Reals) to be smuggled into the U.S., and that one-half must be paid up-front, with the remaining R$16,000 paid upon arrival. During multiple meetings at JULIANA and FABIO's residence, as well as at the office of Costamares Travel Agency, which was owned and operated by JULIANA, Da Silva discussed with JULIANA and FABIO the forms of payment and received assurances and instructions on how the scheme would work.

16. Da Silva stated that JULIANA and FABIO instructed him to dress and act like a student and business person. His travel was arranged through Paris, then London and Nassau, Bahamas. Da Silva advised that his flights and hotel reservations in Paris and Nassau (London was just a stopover at the airport) were all made by JULIANA. Before departing Brazil, JULIANA instructed Da Silva where to go upon arrival at each destination. Once at his hotels in

Paris and Nassau, JULIANA called Da Silva in his room to check on his status and give him more instructions. After several days in Nassau, JULIANA instructed Da Silva (who was traveling with Pereira Marques and Melo Santos), to travel to Freeport, Bahamas, and she gave Da Silva the name of a hotel where they were to stay. Upon arrival in Freeport, however, Da Silva and the others discovered the hotel did not exist and so they selected a hotel across the street.

17. While walking across the street, Da Silva and the others encountered a black male who called out as if he were looking for them. Previously, while in Nassau, JULIANA had instructed Da Silva that he would be met by a black male in Freeport who would assist them. Da Silva called JULIANA later that day and JULIANA advised him that follow-on travel to the U.S. would occur within a short period of time. Sometime later, JULIANA spoke with Da Silva and explained that she had had trouble with "Lupita" and so JULIANA was arranging alternative travel to the U.S. for the group. A few days later, Da Silva and the group were taken to a house and met several other Brazilians attempting to enter the U.S. illegally. The group then was taken to a boat and departed for the U.S.

18. Da Silva also explained during his post-Miranda interview that after he was deported following his September 16, 2009 attempted entry into the U.S., Da Silva met with JULIANA and FABIO again. JULIANA offered to arrange for Da Silva to be smuggled into the U.S. again, and this time he would have to pay the only half of the R$32,000 fee (R$16,000) after successfully entering the U.S. JULIANA and FABIO refused to return the R$16,000 Da Silva had already paid and advised him that being caught and deported by U.S. authorities was part of the risk of being smuggled.

7

19. Based upon the foregoing, your affiant submits that there is probable cause to believe that JULIANA Rose Tome Froes (TOME-FROES) and FABIO Rodrigues Froes (RODRIGUES-FROES), did conspire to commit the offense of encouraging and inducing aliens to come to, enter, or reside in the United States, with knowing and reckless disregard of the fact that such coming to, entry, or residence is and will be in violation of law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I). FURTHER AFFIANT SAYETH NAUGHT.

_____
ALEXANDRE SCHMIDT, SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Sworn and subscribed before me this
27 day of September, 2012.

_____
BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE

8